**Jeffrey MILLER, Appellant
(Defendant Below),**

v.

**STATE of Indiana, Appellee
(Plaintiff Below).**

**No. 685S227.**

Supreme Court of Indiana.

Sept. 4, 1986.

Nancy L. Broyles, McClure, McClure & Kammen, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Jody Cusson-Cobb, Deputy Atty. Gen., Indianapolis, for appellee.

SHEPARD, Justice.

Appellant Jeffrey Miller was convicted after a bench trial of four charges relating to the abduction and rape of an Indianapolis woman. Three were class A felonies: criminal confinement, Ind.Code § 35–42–3–3 (Burns 1979 Repl.); rape, Ind.Code § 35–42–4–1(a) (Burns 1984 Supp.); and criminal deviate conduct, Ind.Code § 35–42–4–2 (Burns 1984 Supp.). The final charge was robbery, a Class B felony, Ind. Code § 35–42–5–1 (Burns 1984 Supp.). Miller was sentenced to concurrent terms of 30 years for each of the class A felonies and 10 years for the robbery.

Miller raises one issue in this direct appeal: whether the trial court erred when it

overruled a motion to suppress his taped statement to police.

The evidence at trial showed that Miller and three friends abducted a woman as she walked to her car in a restaurant parking lot early in the morning of February 26, 1984. Displaying two guns, the men forced her into the back seat and drove away in her vehicle. She was ordered to undress and to hand over her money.

Three of the men proceeded to rape her or force her to perform oral sex. After approximately ninety minutes, the men left their victim on the highway clothed in only one sock.

Timothy Smith was arrested for the four charges in early October 1984. Miller was arrested October 17, 1984 after Smith implicated him. Detective Stephen Odle told Miller of Smith's incriminating statement and asked Miller to make his own statement. Miller agreed, and Odle read the *Miranda* rights to him. At the hearing on the motion to suppress, the State offered a transcript of the tape-recorded statement, which revealed the following:

Q. I'd like to read something to you Jeffrey that we had the opportunity to go over earlier. Custodial Interrogations—Advice of Rights. Before we ask you any questions, you must understand your rights. One, you have the right to remain silent. Two, anything you say can be used as evidence against you in a court. Three, you have the right to talk to a lawyer for advice before we ask you any questions and have him with you during questioning. Four, if you cannot afford a lawyer one will be appointed for you before any questioning. Five, if you decide to answer questions now without a lawyer you'll have the right to stop answering questions at anytime. You also have the right to stop answering questions at anytime until you talk to a lawyer. You understand what I just read to you?

A. Yes.

Q. Sorry, you have to speak up, do you understand what I just said to you? Any of those points you are not quite clear of?

A. I told you about this one.

Q. Okay, but the five things I just read to you, you're aware of?

A. Yes.

Q. Okay, let's go over the things that you aren't clear of. Waiver of rights, the above statement of my rights has been read to me and I am fully aware of those rights and do fully understand those rights, do you agree with what I just read to you? Are you aware of your rights?

A. Okay, that's saying that I am aware of these that you just read?

Q. Correct.

A. Okay.

Q. I hereby waive my rights and state that I do not want a lawyer at this time and that I am willing to make a statement and answer questions, do you agree with that statement?

A. Yes.

Q. This waiver of my rights has been knowingly and voluntarily made by me without any promises or threats having been made to me and further without any pressure or coercion having been used against me, do you understand and agree with that statement?

A. Yes.

After Miller's identification of his signature on the Waiver of Rights form, the statement continued:

Q. Are you in agree (sic) of this, were you aware of this before you signed it?

A. Yes, _____. (apparently inaudible)

Q. Do you have any questions about that before we continue?

A. This is a little, this is a little thing but I understand.

Q. You do understand it, do you understand it enough to sign it?

A. Yes, I already signed it.

Miller proceeded to give a statement in which he admitted to accompanying the three other men who abducted, robbed and raped the victim. Miller denied raping the woman; he later characterized his role as asking her "to cooperate." He said he never held the gun used by the other men to perpetrate the crimes. After Miller concluded, the following occurred:

Q. Are you telling me the truth now?

A. Yes.

Q. All the statements you made here today been truthful?

A. Yes.

Q. They been of your own free will?

A. Yes.

Q. Have I or Detective Sickles here helped you with any of the answers?

A. No.

Q. We threaten you in anyway to make this statement here today?

A. No. You got to do it right.

Q. We promise you anything to make a statement here today?

A. No.

Q. You understand the statements you've made here today can be held against you in a court?

A. Can do what?

Q. Do you understand that the statements you've made here today can be used against you in a court? You understand that, correct?

A. I thought you said this things (sic) was for me because Timothy made a statement on me?

Q. Correct. But, you still understand that we still can use this as evidence against you in a court?

A. No.

Q. You didn't understand that?

A. No, you said this was a statement ...

Q. Let's go over something here that you signed here. Did you understand your waiver of rights when I read this sheet of paper here to you?

A. No, I told you I didn't exactly understand it.

Q. Did you understand that you had the right to remain silent? I explained that to you, didn't I?

A. Yeah.

Q. Did I or did I not explain to you that anything you say can be used as evidence against you in a court? You realized that, didn't you?

A. W,ait a minute. What?

Q. Anything you say can be used as evidence against you in a court.

A. Naw. I though this thing was for me.

Q. The statement is for you.

A. Well, how can it be for me and against me, too, at the same time?

Q. You're making the statement.

A. Well, how can it be used against me, then?

Q. How can it be used against you?

A. Yeah.

Q. Because it can be used as evidence against you.

A. I thought this was my evidence against what Timothy had said about me.

Q. Let's read back through this again. Did you have the opportunity to look at this sheet of paper I'm reading from?

A. Yeah.

Q. How many times did you have an opportunity to look at it?

A. Couple of times, three.

Q. Okay. Did I read it to you two or three times?

A. Yeah.

Q. Okay. Did you sign it?

A. Yeah.

[And so on.]

The prosecution has the burden to prove beyond a reasonable doubt that in giving a statement or confession a defendant voluntarily and intelligently waived his rights. *Shepler v. State* (1980), 274 Ind. 331, 412 N.E.2d 62. In determining whether the

State has met this burden, we look to the totality of the circumstances to determine whether the defendant's confession was prompted by any inducements, violence, threats, promises or other improper influences. *Id.* This Court will not reweigh evidence but will affirm the trial court if there is substantial evidence of probative value to support the finding of voluntariness. *Richardson v. State* (1985), Ind., 476 N.E.2d 497.

Miller was 27 when he gave the statement. He had completed a year of business college, although the sentencing report indicated there was no record of his graduation from high school. He had a juvenile record and four arrests as an adult, although he had never been charged with a felony. When police first attempted to serve him with an arrest warrant, Miller posed as Louis Miller, his dead brother. The officers returned about 7 a.m. the next morning after they discovered Miller's deception. They found him hiding in the crawlspace under his home. The officers began questioning Miller after taking him to police headquarters.

Miller studied the simple waiver of rights form before signing it. Detective Odle explained Miller's rights to him several times and clarified them after Miller expressed some confusion. Miller ultimately agreed that he understood his rights and was waiving them voluntarily. Miller never explicitly expressed confusion about the use of incriminating statements in court until he had completed his statement, despite the fact that the detective had raised that issue several times.

It appears that Miller may have expected that he could exonerate himself by giving a statement refuting the charges leveled by Timothy Smith. Miller had expected to avoid criminal prosecution with his statement, not to invite it.

The record indicates that Miller understood that any statements which he made could be used against him in court. He simply did not realize that this particular statement, which he considered exonerating, could also be incriminating. A review of the totality of the circumstances shows that Miller knowingly, intelligently and voluntarily waived his rights. His statement therefore was admissible.

The judgment of the trial court is affirmed.

GIVAN, C.J., and DeBRULER, PIVARNIK and DICKSON, JJ., concur.